IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>NATIONAL RAILROAD PASSENGER<br>CORPORATION (AMTRAK),</td><td>*</td><td></td></tr>
<tr><td>    Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>      v.</td><td>*</td><td>CIVIL NO.: WDQ-08-1501</td></tr>
<tr><td>RAILWAY EXPRESS, LLC,</td><td>*</td><td></td></tr>
<tr><td>    Defendant.</td><td>*</td><td></td></tr>
</table>

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

National Railroad Passenger Corporation ("Amtrak") sued
Railway Express, LLC for a declaratory judgment and injunctive
relief. For the following reasons, Amtrak's motion for summary
judgment, and Railway Express's cross-motion for summary
judgment, will be granted in part and denied in part.[1]

I.    Background[2]

Amtrak sued Railway Express over its claimed rights in a
subsurface area of land ("Parcel") near Baltimore's Penn Station.

---

[1] Because the issues have been adequately briefed, a hearing is
not necessary.

[2] In reviewing a motion for summary judgment, the non-movant's
evidence "is to be believed, and all justifiable inferences are
to be drawn in [his] favor." *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986). In reviewing cross motions for
summary judgment, the Court "consider[s] and rule[s] upon each
party's motion separately and determine[s] whether summary
judgment is appropriate to each." *Monumental Paving &
Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797
(4th Cir. 1999).

The Parcel is adjacent to Amtrak's railroad tracks, and beneath an apartment and retail building, now owned by Railway Express. ECF No. 1 ¶1.

At the turn of the 20th century, the Pennsylvania Railroad Company and the Northern Central Railway Company (collectively "Railroads")--Amtrak's predecessors-in-interest--owned the Parcel and the real estate above it. ECF No. 96 Attach. 6 at 3. In 1928, United Post Offices Corporation ("United Post") agreed with the United States Postmaster General to lease the rights to "build, occupy, and use a building and the driveways above [the parcel]" from the Railroads. *Id.* United Post would build a Post Office and sub-let the building to the United States Postal Service. The Railroads agreed to include an option in the lease allowing the United States Post Office to purchase the property in fee simple "subject to easements running to The Pennsylvania Railroad for the use of [the] ground level for right of way." *Id.*

United Post executed the lease and sub-let the building to the United States Postal Service. ECF No. 96 Attach. 5 at 1. The lease included the option for the United States.[3] *Id.* at 21.

---

[3] The purchase option reserved to the Railroads the right to use the Parcel for:

> their railroad and station tracks and facilities and for the use and operation thereon and in connection therewith of engines, trains, cars and other

In 1944, the United States Government filed a condemnation proceeding in the U.S. District Court for the District of Maryland to acquire the land. ECF No. 96 Attach. 13. In February 1946, during the condemnation proceeding, the Government and the Railroads entered into an agreement stating their respective rights in the Parcel ("1946 Agreement"). ECF No. 86 Attach. 7 [hereinafter "1946 Agmt."]. The 1946 Agreement gave the Railroads an easement for the subsurface area beneath the building for "railway purposes." 1946 Agmt. at 3. It permitted the Government to use the subsurface area as long as it did not unreasonably interfere with the Railroads' use. *Id.* at 6. In April 1946, the parties filed an Amendment to the Declaration of Taking ("Amendment"), containing the terms of the 1946 Agreement. ECF No. 86 Attach. 8 [hereinafter "Amend."].[4]

---

equipment, and for all other purposes incident to or connected with the construction, maintenance, use, operation and renewal of that railroad.

ECF No. 96 Attach. 5 at 21-22.

[4] The agreement reserved for the Railroads the right to use the parcel:

(a) . . . for railway purposes, that is to say, the right to use said subsurface in the manner and for the purposes in and for which the . . . railroads now use the same and all other railway and related purposes as the same may exist, arise, change and/or develop from time to time including (without being limited to) (1) the right to maintain, use, replace and remove . . . and to install, maintain, use, replace and remove without interference, any future tracks . . .

3

Initially, railroad tracks for delivering and shipping mail ran throughout the Parcel, connecting loading docks under the Post Office to Baltimore's Pennsylvania Station. ECF No. 96 Attach. 5 at 4-5. The Railroads and Amtrak, have since used the Parcel for package, baggage, and casket loading and unloading, equipment and track maintenance and storage, railroad security, training, and employee parking.[5] In addition, Amtrak maintains and uses one railroad track on the north side of the Parcel. ECF No. 86 Attach. 10 at 4.

> including, at all events, the right to have a minimum 9 foot lateral clearance between the face of any columns and/or foundations and/or fender walls and/or other structures in said subsurface and the center line of the existing tracks (until said tracks are removed by the railroads, their successors or assigns), and the same minimum lateral clearance in respect to the proposed future tracks . . . and (2) including the right to operate steam locomotives or other tractive power on the railroad tracks now or hereafter located therein.
>
> (b) . . . to operate and use [on the Parcel], and to maintain, repair, renew, change or alter, and remove therefrom, such equipment, devices and facilities now used or hereafter to be used in the operation of the railroads, as may be reasonably required for railway purposes.

Amend. ¶3.

[5] ECF No. 103 Attach. 8 at 40:8-15, 42:5-20, 43:1-15, 49:5-19 [hereinafter "Catania Dep."]; ECF No. 86 Attach. 10 at 4-5 (stating, in Amtrak's answer to interrogatories, that it uses the Parcel for: access to railroad tracks, generator maintenance, gathering and storing tools and equipment, conducting police operations, storing a dumpster, vehicles and equipment, employee parking, security operations, and communications).

By conveyances in 1955 and 1973, the Government transferred its interest in the building to Baltimore City. ECF No. 96 Attach. 16; *Id.* Attach. 67. The City used the site for the Housing Authority of Baltimore City ("HABC"). ECF No. 96 Attach. 16. HABC employees regularly parked on the parcel. ECF No. 96 Attach. 62 ¶¶8-9.

In 1976, under the Regional Rail Reorganization Act of 1973, the Government consolidated railroad companies, and conveyed their property rights, including those in the Parcel, to Amtrak. ECF No. 86 Attach. 2 at 5.

On November 26, 2001, Baltimore City, no longer using the building, issued a Request for Proposal ("RFP") to develop the former Post Office. ECF No. 96, Attach. 20. The RFP stated that the building and property were offered

> in fee simple subject to the rights of the railroad to operate, maintain and replace its track located beneath the improvements, together with the rights of the railroad to an access road, parking lot and the right to attach its equipment to the supports and underside of the [building].

*Id.* at 2. Railway Express submitted a proposal and won the bid. ECF No. 96 Attach. 1 at 15.

On December 11, 2002, a Railway Express representative met with Bob Warfield and Tom Emge, Amtrak representatives, to

discuss Railway Express's plans for the Parcel.[6]  In his

memorandum of the meeting, the Railway Express representative

states that he told Emge and Warfield that Railway Express

planned:

> to pav[e a] grade level parking area below the
> perimeter edge of the street level platform
> surrounding the Railway Express building and creat[e]
> a new level of parking between the current grade level
> and the street level above. . . .  Restricted access
> to the tracks could be done with a fence.[7]

ECF No. 96 Attach. 21 at 1-2.  The representative also noted

that Les Town, another Amtrak employee, "indicated that he

believed that the Railroad had an[] easement on the property and

they were not interested in changing that arrangement at this

time."  *Id.* at 2.

On January 7, 2003, Railway Express's attorney, Mark

Dopkin, noted that during another meeting with Amtrak, Les Town,

an Amtrak employee,

> expressed a view that AMTRAK, as successor to The
> Pennsylvania Railroad Company, had the right to the
> use of the subsurface area under the existing building
> and that the proposed construction of a parking deck
> under the building would be in violation of the
> Railroad's rights.

---

[6] At the time, Railway Express did not own the parcel; it took
title in 2005.  ECF No. 96 Attach. 26.

[7] At about this time, Railway Express planned to create 182
parking spaces in the new garage.  ECF No. 96 Attach. 23
(blueprints for Railway Express subsurface area dated 12/06/02).

ECF No. 103 Attach. 6. Dopkin, having read the 1946 Agreement, disagreed with Town's conclusion. *Id.* On April 14, 2003, Amtrak's Senior Associate General Counsel Jane Spangler-Weiss replied to Dopkin that Amtrak "disagree[s] with [Railway Express's] assertions as to Amtrak's rights," but Amtrak was "always interested in new development." ECF No. 103 Attach. 11. On April 21, 2003, Dopkin responded that "it is obvious that we disagree." ECF No. 96 Attach. 25. Dopkin added that he was pleased to hear that Amtrak saw "mutual[] benefit from further development" and he thought Amtrak's Les Town would "get back to [Railway Express representatives] with the number of parking spaces Amtrak would need and the minimum dimensions for access through the parking area to serve the main station." *Id.*

On June 30, 2005, Railway Express took title to the property. ECF No. 96 Attach. 26.

On March 13, 2007, Amtrak's John Diamonte met with Railway Express's Marty Azola to discuss the Parcel. ECF No. 96 Attach. 33. According to Railway Express's itinerary for the meeting, the parties discussed a "hotel enhancement" and sharing parking revenue. ECF No. 96 Attach. 30. Two days later, Diamonte emailed Azola, stating that he and another Amtrak employee would review Railway Express's plans for the Parcel, and that he expected that "any work along Amtrak rails will be deferred"

until Amtrak reviewed and commented on the plans. *Id.*[8]
Railway Express states that on March 13, 2007, it sent Amtrak
plans of the area that "clearly showed . . . [a] parking
layout." ECF No. 103 Attach. 19 at 5 (Railway Express's answers
to Amtrak's interrogatories).

On April 9, 2007, Amtrak's Jack Schweitzer told Railway
Express's Tony Azola that he "didn't read anything in [an
environmental remediation plan for paving the Parcel] that
should be an issue with Amtrak." ECF No. 96 Attach. 35. On
September 10, 2007, Tony Azola emailed Diamonte "a drawing
showing [a] proposed fence and other modifications to the
parking area" on the Parcel, and asked Diamonte to respond "so
we can discuss these proposed changes" to the development plan.
ECF No. 96 Attach. 38.

By December 28, 2007, Railway Express had paved the Parcel
and built a security fence around the rail tracks (an area that
remained unpaved to accommodate Amtrak), leaving an opening for
a trash truck. ECF No. 96 Attach. 40. In an email to Amtrak
about this progress, Marty Azola also proposed that Amtrak buy
the land "on [Amtrak's] side of the new fence." *Id.*

Amtrak employees Walter Foura and Richard Catania testified
that the fence around the tracks and use of the Parcel for

---

[8] Railway Express "never received any objection" from Amtrak
representatives until 2008. ECF No. 110 Attach. 5 at 4.

commercial parking will affect Amtrak's use of the Parcel.
Catania testified that he will need to remove the fence for some
maintenance and repair operations near the tracks. Catania Dep.
40:8-15. Foura testified that the fence prevents vehicles from
accessing the tracks to conduct required testing, service a
generator,[9] and remove contaminated water from a fuel tank dam
basin.[10] ECF No. 96 Attach. 50 at 86:2-14, 87:1-15. In
addition, he stated that Amtrak has been unable to move its
large vehicles over the Parcel to the tracks because the fence
gate is too narrow for large vehicles. *Id.* at 88:20-21, 89:1-6
(confined space equipment trailer), 90:15-21, 91:1-9 (baggage
carts and casket transport). Amtrak has continued loading
baggage and caskets through the Parcel, but it had to purchase
smaller baggage carts to fit through the gate. *Id.* at 91:1-9.

Foura also testified that for track and train repairs,
Amtrak needs to move "an extensive amount of maintenance
equipment . . . into the [Parcel, and must] access the area in .
. . a very limited time frame" to avoid shutting down all Amtrak
operations. ECF No. 96 Attach. 50 at 80:2-11. Catania added
that, for some repairs requiring construction, Amtrak brings

---

[9] Amtrak does not own the generator but "service[s it] when
required." ECF No. 96 Attach. 50 at 87:1-3.

[10] Amtrak employees have carried the contaminated water through
the Parcel by bucket under the current sharing arrangement on
the Parcel. ECF No. 96 Attach. 50 at 87:12-15.

"larger truck[s]" onto the Parcel, requiring clearance of
parking spaces so that the truck fits in the Parcel and can
store equipment. Catania Dep. 43:10-18. In an emergency on the
tracks--such as a derailed train or a train fire--the fire
department accesses tracks through the Parcel and needs an
immediate path across the Parcel. *Id.* at 49:5-19.

In addition to paving the Parcel and fencing off the
remaining track, Railway Express plans to create a second level
of parking by building a "mezzanine" above the Parcel. ECF No.
96 Attach. 23.[11]

On January 25, 2008, Amtrak's Philip Economou emailed Marty
Azola, offering to put Azola in touch with a hotel developer to
discuss leasing parking spaces on the Parcel to a hotel for its
patrons.[12] ECF No. 96 Attach. 42 at 3.

On June 10, 2008, Amtrak filed this suit for (1) trespass,[13]
(2) a declaratory judgment that it has rights in the Parcel and
Railway Express has no right to exclude it from using the

---

[11] Amtrak implied that Railway Express plans to build another
fence around the perimeter of the Parcel. *See* ECF No. 86
Attach. 2 at 29. Amtrak has not identified evidence of a future
fence.

[12] Economou testified that he did not recall this exchange. ECF
No. 103 Attach. 1 at 185:16-19.

[13] On August 28, 2009, Amtrak dismissed its trespass claim. ECF
No. 45. On March 31, 2010, it withdrew its jury trial demand.
ECF No. 60.

Parcel, and (3) injunctive relief barring Railway Express from the Parcel without Amtrak's permission, and requiring Railway Express to replace a barrier fence it removed and remove the fence around the track.[14] ECF No. 1. Amtrak also moved for a temporary restraining order and/or preliminary injunction enjoining Railway Express from using--or prohibiting Amtrak from using--the Parcel. ECF No. 2. On July 1, 2008, Railway Express opposed Amtrak's motion and moved for a preliminary injunction. ECF No. 8. It argued that it had exclusive use of the Parcel as long as it did not interfere with Amtrak's limited, permitted railroad uses. *Id.*

On July 3, 2008, the parties filed a consent order agreeing that until the Court determined the issue, Amtrak would have exclusive use of the north side of the Parcel ("Parcel 1"), and would grant Railway Express reasonable access to Parcel 1 to maintain the REA Building. ECF No. 9. Railway Express would have exclusive use of the south side of the Parcel ("Parcel 2"), around which it would have a security fence, allowing Amtrak to enter Parcel 2 for safety and security purposes. *Id.* On July 17, 2009, the Court granted Amtrak's motion for a preliminary

---

[14] On June 11, 2008, Railway Express sued Amtrak seeking declaratory judgment; that suit was consolidated with this case. *Ry. Express v. Nat'l R. Passenger Corp. (AMTRAK)*, No. WDQ-08-cv-1511, ECF No. 10 (July 8, 2008 order consolidating case with No. WDQ-08-cv-1501).

injunction and denied Railway Express's motion. ECF No. 40. The Court ordered the parties to continue abiding by the conditions of the consent order. *Id.*

On November 12, 2010, Amtrak moved for summary judgment. ECF No. 86. On January 3, 2011, Railway Express filed a cross-motion for partial summary judgment. ECF No. 96.

II. Analysis

A. Standard of Review

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[15] A party may request summary judgment on "part of [a] claim or defense," and the Court may list in its order all material facts that are "not genuinely in dispute[,] . . . treating the fact as established in the case." *Id.* 56(a), (g).

In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A

---

[15] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

12

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted). When cross motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting,* 327 F.3d 355, 363 (4th Cir. 2003) (*citing Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003)).

B. Amtrak's Motion for Summary Judgment

Amtrak moves for summary judgment and seeks declarations that (1) its easement remains valid and its past, current, and intended uses of the parcel are for "railway and related pur-poses," and (2) Railway Express's intended use will unreasonably interfere with the easement.[16]  ECF No. 86 Attach. 2 at 2.

---

[16] Railway Express contends that Amtrak seeks to "exclude [Railway] from using the ground level." ECF No. 96 Attach. 1 at

1.    "Railway Purposes" is Broadly Construed

In interpreting the scope of an easement, the Court attempts to "ascertain and give effect to the intention of the parties at the time the contract was made." *Md. Agric. Land Pres. Found. v. Claggett*, 412 Md. 45, 62, 985 A.2d 565, 575 (2009). "[T]he primary consideration in construing the scope of an express easement is the language of the grant." *Chevy Chase Land Co. v. United States*, 355 Md. 110, 143, 733 A.2d 1055, 1073 (1999). In addition to the particular language, the Court will "consider the deed as a whole, viewing its language in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of the conveyance." *Id.* at 123, 733 A.2d 1062.

i.    Language of the Grant

The terms of the grant gave Amtrak's predecessors-in-interest the right to use the Parcel for "railway and related purposes," including using, repairing and maintaining railroad equipment, devices and facilities. Amend. ¶3. The terms permit such changes in the Railroad's purposes "as . . . may exist, arise, change and/or develop from time to time." *Id.*

---

32.   Amtrak does not request exclusive use, recognizing in its summary judgment motion that Railway Express has "explicit" rights in the Parcel. ECF No. 103 at 4; *id.* at 4 n.6.

14

Railway Express contends that "railway purposes" is ambiguous because "railroad" and "railway" can have several meanings.[17] ECF No. 96 Attach. 1 at 30. It argues that the Court must consider the intent of the parties to determine the scope of the easement. *Id.* at 30-31. "Railway and related purposes" is ambiguous, as there is no indication in the Amendment of what "related" means, and what constitutes a "railway purpose." Accordingly, the Court will consider the parties' intent and circumstances surrounding creating of the easement.[18]

### ii. Parties' Intent

Railway Express contends that the parties intended to limit the Railroads' rights in the property to operating and maintaining trains and tracks on the Parcel. ECF No. 96 Attach. 1 at 31, 34. Railway Express relies on the Government's: (1) taking the land through a condemnation proceeding rather than exercising its option to purchase, and (2) creating the easement to serve the Post Office. *Id.* at 10, 31-34.

---

[17] *E.g.* "railroad" or "railway" can mean the "roadbed, tracks, and necessary appurtenances," or it can include "all structures and appurtenances necessary to operation." ECF No. 96 Attach. 1 at 30 (*quoting* Elliott & Elliott, *A Treatise on the Law of Railroads*, (3d Ed., 1921), Definitions, § 5(4)).

[18] Contrary to Amtrak's contention, and because of the ambiguity of the terms, the Court is not required to disregard extrinsic evidence. *See* ECF No. 103 at 10.

Railway Express contends that, by taking the property by condemnation rather than exercising its purchase option, the Government intended to limit the Railroads' easement rights because the option easement was broader than the condemnation easement. *Id.* at 10. The option to purchase would have allowed the Railroads to use the Parcel for

> railroad and station tracks and facilities and for the use and operation thereon and in connection therewith of engines, trains, cars and other equipment, and for all other purposes incident to or connected with the construction, maintenance, use, operation and renewal of that railroad.

ECF No. 96 Attach. 5 at 21-22. Railway Express does not explain how "all . . . purposes incident to . . . maintenance, use, operation and renewal" of the railroad, *id.*, is broader than "all . . . railway and related purposes as . . . may exist, arise, change and/or develop from time to time," Amend. ¶3(a). Both grants use broad language, covering "all purposes" that are associated with--"incident to" or "related" to--the railroad's "purposes." Viewing the grants in the light most favorable to Railway Express, they do not show that the United States intended to limit the Railroads' easement rights by condemning the property.

Railway Express similarly fails to show why, if the Government intended to limit the easement to running trains to and from the Post Office, it granted the Railroads broad rights

for "all . . . railway and related purposes as . . . may exist, arise, *change and/or develop* from time to time." Amend. ¶3(a) (emphasis added). The terms of the grant contemplate and permit changes in the Railroad's use of the Parcel. As Railway Express notes, the agreement should "be given a reasonable rather than an unreasonable construction." ECF No. 96 Attach 1. At 35 (*quoting Cadem v. Nanna*, 243 Md. 536, 544, 221 A.2d 703, 708 (1966)). Construing the broad language to grant very limited rights would be unreasonable. Railway Express has no evidence that the parties intended to limit the easement to operating trains on the Parcel.

iii. General Understanding of "Railway Purposes"

At the time of the Amendment, use of an easement for railway purposes generally included any use that, "directly or indirectly, contribute[d] to the safe, economical and efficient operation of the road, and [did] not interfere with the rights of property pertaining to the adjacent lands."[19] *Mitchell v.*

---

[19] This meaning has not changed. *See Hynek v. MCI World Commc'ns, Inc.*, 202 F. Supp. 2d 831, 835 (N.D. Ind. 2002) (Activities that are "essential for the safe and efficient operation of the railroad" are undertaken for railway purposes.); *McSweyn v. Inter-Urban Ry. Co.*, 256 Iowa 1140, 1147, 130 N.W.2d 445, 448 (1964) ("A railroad may make any use of land acquired for railroad purposes which directly or indirectly contributes to the safe, economical and efficient operation of its road and does not interfere with the property rights of adjoining owners."); *Zobrist v. Culp*, 570 P.2d 147, 154 (Wash. App. 1977) (same).

*Ill. Cent. R. Co.*, 384 Ill. 258, 264, 51 N.E.2d 271, 274
(1943).[20] "[A]ll things . . . within the scope of [a railroad's]
charter powers, which may be essential or incidental to its full
and complete use to accomplish the purpose for which the
easement was acquired" are uses for railway purposes. *Id.* (the
installation of gas stations and sale of gas on a railroad
right-of-way granted for "railroad purposes" were within the
scope of the easement).

Accordingly, "railway purposes" encompasses a broad range
of activities.[21]

_____

[20] Railway Express contends that because in *Mitchell* the "rail
track was actually located in the right of way and trains ran"
on it, the holding is not persuasive here. ECF No. 110 Attach.
4 ¶3. The *Mitchell* Court did not so limit its reasoning:

> Railroad purposes include such a variety of uses as
> changes in circumstances may bring about, depending
> upon the facts in each case.

*Mitchell*, 384 Ill. at 264, 51. N.E.2d at 274. There is no
contemporary Maryland case construing the scope of "railway
purposes," but earlier authority supports the *Mitchell*
understanding. *See Buckler v. Safe Deposit & Trust Co. of
Balt.*, 115 Md. 222, 80 A. 899, 902 (1911) ("railroad purposes"
included "property owned and used by the railroad for its
corporate purposes, incident to the operation and management of
its franchise").

[21] For example, installing and using "telegraph and telephone
lines for railroad business" is a use for railroad purposes.
*Potomac Edison Co. v. Routzahn*, 192 Md. 449, 460, 65 A.2d 580,
585 (1949). Leasing unused portions of land, over which the
railroad holds an easement, to railroad patrons so that they can
maintain shipping warehouses for freight receipt and delivery,
is within the scope of railway purposes. *Miss. Invs. v. New*

2. Amtrak Uses the Parcel for "Railway Purposes"

Amtrak contends that the undisputed[22] deposition testimony
and answers to Railway Express's interrogatories it cites show
that there is no dispute of material fact that it uses the
Parcel for railway purposes.[23] Amtrak officers and employees
stated that Amtrak uses the Parcel for access to the tracks,
maintenance of a generator, staging for employees to prepare to
maintain or repair tracks, storage of a dumpster, employee
parking, security, and police operations. ECF No. 86 Attach. 10
at 5. Amtrak operates one track on the Parcel. *Id.* at 4.
Amtrak also uses the Parcel to "transfer . . . baggage from the
long distance trains to the track level elevator to get the
baggage up to the passenger concourse."[24] Amtrak's shipping

---

*Orleans & N.E.R. Co.*, 188 F.2d 245, 247 (5th Cir. 1951)
(applying Mississippi law).

[22] Railway Express challenges the answers to interrogatories,
claiming that the answer is "conclusory . . . hearsay" not
admissible in evidence. ECF No. 96 Attach. 1 at 46-47. Railway
has not shown that the answers "cannot be presented in a form
that would be admissible in evidence," as deposition testimony
supports each of the listed uses. Fed. R. Civ. P. 56(c); *see*
ECF No. 86 Attach. 4 and testimony cited therein.

[23] Both forms of evidence are appropriate at the Summary Judgment
stage. Fed. R. Civ. P. 56(c)(1)(A). Railway Express has
identified no evidence that Amtrak is *not* engaging in the listed
activities.

[24] ECF No. 86 Attach. 17 at 89:14-17 (deposition of Walter Foura,
Amtrak senior project officer).

business (also called Railway Express) loads packages and human remains by bringing them through the Parcel.[25]

Railway Express contends that these uses are beyond the scope of the easement as a matter of law and, alternatively, there are genuine disputes of material fact about whether the uses are within the scope of the easement. ECF No. 96 Attach. 1 at 34-37.

In light of the broad understanding of "railway purposes," and the even broader language in the grant--"railway *and related* purposes"--Amtrak's use of the Parcel for storage, security, training, access for train loading, and operation of the remaining track is within the scope of the easement because they "contribute[] to the safe, economical and efficient operation" of the railroad. *See McSweyn*, 256 Iowa at 1147, 130 N.W.2d at 448.

Viewing the evidence in the light most favorable to Railway Express, there is no genuine dispute of material fact, and Amtrak is entitled to summary judgment on the issue of Amtrak's use of the Parcel: Amtrak used the Parcel for railway and related purposes.

---

[25] ECF No. 96 Attach. 49 at 67:3-21, 68:1-13 (deposition of Paul Mallon, Amtrak district manager of stations).

3.   Amtrak is Not Estopped from Exercising its Rights

Railway Express contends that Amtrak is estopped from asserting its rights in the Parcel because it failed to object to Railway Express's improvements.   ECF No. 96 Attach. 1 at 39.

Equitable estoppel precludes a party from asserting its rights when, by "voluntary conduct," it causes another person to "in good faith rel[y] on such conduct, and [that person is] led thereby to change his position for the worse." *Cunninghame v. Cunninghame*, 364 Md. 266, 289, 772 A.2d 1188, 1201 (2001). Estoppel "is a question of fact." *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323, 389 A.2d 887, 903 (1978).

Estoppel requires "voluntary conduct or representation[s]" by the party to be estopped. *Cunninghame*, 364 Md. at 289-90, 298, 772 A.2d at 1202.   "Mere silence will generally not raise an estoppel" unless the silent party--against whom estoppel is asserted--has a duty to speak.   *Impala*, 283 Md. at 323, 389 A.2d at 903 (1978).   That one party has greater knowledge of the circumstances, or its silence "precludes another from taking steps to protect [it]self from a loss" does not necessarily create a duty to speak.   *Crosby v. Crosby*, 986 F.2d 79, 82 (4th Cir. 1993).   A party has a duty to speak only when silence "constitutes a fraud."   *Id.*

Railway Express emphasizes that it met with Amtrak and sent emails *to* Amtrak personnel, but identifies no evidence of *conduct* by Amtrak indicating that it would not exercise its rights in the Parcel. Instead, it relies on Amtrak's silence,[26] which, under Maryland law, is insufficient to estop a party unless that party has a duty to speak.[27] It contends that, because Amtrak employees "participated in . . . meetings and communications regarding the respective rights of the parties," it had a duty--and failed--to voice its objections to Railway Express's plans. ECF No. 110 at 16; *id.* at 16 n.10.

Amtrak contends that it did not object to paving the Parcel or using it for Railway Express employee parking because those

---

[26] *See, e.g.*, ECF No. 96 Attach. 1 at 42; ECF No. 110 Attach. 5 ¶¶7-8.

[27] Railway Express relies on the

> familiar principle that when one stands by and sees another making improvements to property to which he has some claim or title, and does not give any notice or objection, he cannot afterwards in good conscience assert his own claim or title against the improver.

ECF No. 110 at 15 (*quoting Rogers v. P-M Hunter's Ridge, LLC*, 407 Md. 712, 730 n.11, 967 A.2d 807, 818 n.11 (2009)). The *Rogers* court noted, however, that it was explaining the doctrine of easement by estoppel, and neither party claims an easement by estoppel here. In addition, the court added that "mere silence or acquiescence or failure to object does not operate as an estoppel . . . when the means of knowledge of the true state of the title is equally available to both parties." *Id.* Here, both parties had access to the Amendment. *See* ECF No. 103 Attach. 6 (letter from Railway Express's Dopkin referencing the Amendment). Further, as discussed below, Amtrak satisfied any duty to speak when it objected to the plans in 2002 and 2003.

uses were "completely consistent with the express rights granted to the property owner under the 1946 Agreement and Amendment."[28] ECF No. 103 at 34. It asserts that only "the intended obstruction of the parcels by fencing and permanent third party parking" will violate its easement rights.[29] *Id.*

Railway Express acknowledges that Amtrak asserted its rights before Railway Express began to build the parking garage. ECF No. 103 Attach. 6. In early 2003, before Railway Express took title to the building, Railway Express's attorneys communicated with Amtrak and knew that Amtrak believed building a parking garage on the Parcel would "be in violation of [its] rights." *Id.* (letter from Dopkin).

Railway Express contends that at that time, the attorneys for the parties agreed that "business persons were working to

---

[28] Accordingly, that Amtrak's Diamonte approved the paving plan, ECF No. 96 Attach. 35, does not constitute acquiescence in the portions of the improvements to which Amtrak objected.

[29] The parties dispute when Amtrak learned that Railway Express planned to use the garage for third party parking and fence off portions of the Parcel. *Compare* ECF No. 86 Attach. 2 at 22 ("Plans dated October 19, 2007, May 29, 2008, and June 4, 2008 show that Railway Express would use [half the Parcel] for leased parking spaces.") *with* ECF No. 96 Attach. 1 at 15 (In December 2002, "the Amtrak representatives were informed that, on grade level, Railway Express planned to use areas for parking and possibly would create a new 'mezzanine' level of parking between the ground level and the street level above.") *and id.* at 18 (On March 13, 2007, Railway Express told Amtrak personnel "that Railway Express tenants would be parking in that area."). The dispute is immaterial because, as noted above, Amtrak did not have a duty to speak after it asserted its rights in 2003, which was before Railway Express began construction.

reach a resolution" and, accordingly, Amtrak had a duty, later
to object to the proceedings. ECF No. 110 at 17. Railway
Express identifies a letter from its own attorney that indicates
an intent to resolve the easement disagreement, *see id.*, but
that letter states only that the parties agreed they could
"mutually benefit from further development" and that *he* thought
Amtrak would tell Railway Express how much space it needed in
the Parcel for access and parking, ECF No. 96 Attach. 25.

Nothing in the communications *from* Amtrak's general counsel
or other Amtrak representatives indicates that they understood
Dopkin's statement to mean that the employees would agree on the
parties' rights in the Parcel, that Amtrak intended to
relinquish its right to use the Parcel, or to change its
position that the parking garage and fence would violate the
easement.[30] *See* ECF No. 103 Attach. 11 (stating only that "While
we disagree with your [Railway Express's] assertions as to
Amtrak's rights, we are always interested in new development.").

_____

[30] Railway Express cannot rely on Economou's suggestion that the
Penn. Station hotel developer lease parking spots from Railway
Express because Railway Express had already completed the
paving, its construction, when Economou told Railway Express
about the leasing idea. ECF No. 96 Attach. 42. Railway Express
accordingly cannot claim it detrimentally relied on the
information. *See Cunninghame*, 364 Md. at 289, 772 A.2d at 1201
(equitable estoppel requires that the harmed individual took
detrimental action in reliance on the action). It cannot rely
on Economou's statement to estop Amtrak from protesting the
mezzanine level because Railway Express has not taken the
detrimental action of building that level. *Id.*

24

Having asserted its rights, Amtrak did not have a duty to repeat

its assertion every time Railway Express brought up the issue.

*Cf. Klein v. Dove*, 205 Md. 285, 295, 107 A.2d 82, 87 (1954).[31]

Railway Express identifies no evidence that Amtrak assented

to leasing parking on the Parcel or creating a second level of

parking. One month after Railway Express first mentioned

fencing off parts of the Parcel and creating a second level of

parking,[32] Amtrak objected to the proposal. ECF No. 103 Attach.

6. In March, 2007, it agreed that Railway Express could pave

the Parcel to satisfy environmental remediation requirements,

ECF No. 96 Attach. 35, but Railway Express did not discuss

installing a fence around Amtrak's track until September, 2007,

ECF No. 96 Attach. 38. Railway Express has no evidence that

---

[31] In *Klein*, the plaintiffs sought injunctive relief and an order
that the defendants remove a fence built across a right of way
the plaintiffs held over the defendants' property. The court
held that the defendants had record notice of the plaintiffs'
right of way because the easement was recorded. The court held
that, notwithstanding the plaintiffs' failure to object to the
obstruction for several years before bringing suit, the initial,
record notice was sufficient to prevent estoppel. 205 Md. at
295-96, 107 A.2d at 87; *see also Oberheim v. Reeside*, 116 Md.
265, 81 A. 590, 594 (1911) (holders of easement through alley
were not estopped from asserting the easement after fee holder
built a house in the alley although they did not protest until
the house was completed. Fee holder had record notice of the
easement, and accordingly the easement holders did not have a
duty to repeatedly assert their rights.). Amtrak's unequivocal
2002 and 2003 assertions of its rights, like record notice in
*Klein* and *Oberheim*, notified Railway Express that Amtrak's
subsequent silence indicated dissent, not agreement.

[32] ECF No. 96 Attach. 21 at 1-2.

Amtrak agreed to the fence. *See id.* (subsequent "update" email from Tony Azola stating that Amtrak "will . . . meet[] with us" to discuss the fence).

Viewing the evidence in the light most favorable to Railway Express, Amtrak is not estopped from asserting its rights in the Parcel.

> 4.  There is a Dispute of Material Fact About Whether Railway Express's Intended Use will Unreasonably Interfere with Amtrak's Use of the Parcel

To date, Railway Express has paved the surface of the Parcel and installed a fence around the track that remains on the Parcel. ECF No. 96 Attach. 40. It plans to create an intermediate level of parking over the Parcel surface. ECF No. 96 Attach. 23.

> i.  Interference as a Matter of Law

Amtrak contends that installing the fence and allowing third party parking reduce the size of the easement, and any change in the size of the easement is an unreasonable interference with the easement. ECF No. 86 Attach. 2 at 32.

For an express easement or right of way in which the servient tenement owner's rights are not expressly stated, the servient owner may use the land in question "for any purpose that does not interfere with the easement." *Miller v. Kirkpatrick*, 377 Md. 335, 349, 833 A.2d 536, 544 (2003) (internal quotation marks and citation omitted) (fences that

26

reduced right of way from 20 to 12 feet wide interfered with easement and would be ordered removed).[33]  *Any* obstruction or other change in the dimensions of such an easement interferes with it and is prohibited.[34]  *Id.* at 350, 833 A.2d at 545.

Under the terms of the easement, Railway Express may use the Parcel unless it *unreasonably* interferes with Amtrak's use. Amend. ¶3(a).  Under this standard, Railway Express may make minor changes to the Parcel if they do not create an additional material burden on Amtrak's use of the easement.[35]

Dedicating property, over which a railroad has a right of way, to public use unreasonably interferes with the railroad's

---

[33] *But see Reddick v. Williams*, 260 Md. 678, 680, 273 A.2d 153, 154 (1971) (Servient owner may use the easement "for any purpose that does not unreasonably interfere with the use of the easement," including placing gates at the entrances and exits of the easement if the dominant owner still has access to the easement.).

[34] Amtrak's argument that Railway Express has changed the size of its easement is misplaced.  Unlike the fence in *Miller*, the fence on the Parcel does not "say[] keep out" to Amtrak.  ECF No. 86 Attach. 2 at 29.  Amtrak has access to both sides of the fence and moves freely through the fence gate.  ECF No. 96 Attach. 49 at 70:6-18.  Accordingly, the fence and gate are more similar to the gates in *Armiger*, *infra*.  Amtrak provides no support for its argument that long-term parking creates a "permanent . . . interference[]" with the easement.  ECF No. 86 Attach. 2 at 29.  Accordingly, Amtrak has not shown that, as a matter of law, Railway Express's improvements unreasonably interfere with the easement.

[35] *See Reid v. Wash. Gas Light Co.*, 232 Md. 545, 551, 194 A.2d 636, 639 (1963); *Reddick v. Williams*, 260 Md. 678, 680, 273 A.2d 153, 154 (1971) (servient owner may install gates at entry and exit of right of way if owner provides free access to dominant estate).

right to operate trains on the easement because allowing the
public to use it as a road renders it impossible for the
railroad to safely run its trains. *Armiger v. Lewin*, 216 Md.
470, 476, 141 A.2d 151, 155 (1958). On the other hand, allowing
others to use an easement does not unreasonably interfere with
the dominant holder's rights if the dominant holder remains able
to continue to use it for its intended purpose. *Id.* at 477-78,
141 A.2d at 155-56 (owner of the servient estate did not
unreasonably interfere with neighbor's right of way for car and
pedestrian access to neighbor's property, when he dedicated the
property to public use). Accordingly, the reasonableness of the
interference is a question of fact and must be considered on a
case-by-case basis.

ii. Evidence of Interference

Amtrak contends that it will not be able to achieve its
railway purposes if Railway Express leases every parking space
on the parcel to third parties and fences off the parking. ECF
No. 103 at 42. It argues that leaving "third-party cars . . .
for extended, indefinite periods on the parcels" would interfere
with its railway uses, including potential security emergencies.
*Id.*

Amtrak relies on testimony from its employees, Walter Foura
and Richard Catania, that the fence around the tracks and
commercial parking impedes its use of the Parcel and access to

the tracks. Catania testified that he will need to remove the fence for some maintenance and repair operations near the tracks. Catania Dep. at 40:8-15. Foura testified that the fence prevented vehicle access to the tracks, necessary to conduct required testing, service a generator, and remove contaminated water from a fuel tank dam basin.[36] ECF No. 96 Attach. 50 at 86:2-14, 87:1-15. He stated that Amtrak has been unable to move its large vehicles through the Parcel to the tracks because the fence gate is too narrow for large vehicles. *Id.* at 88:20-21, 89:1-6 (confined space equipment trailer), 90:15-21, 91:1-9 (baggage carts).

Foura also testified that Amtrak needs to be able to move "an extensive amount of maintenance equipment . . . into the [Parcel, and must] access the area in . . . a very limited time frame" to avoid shutting down all Amtrak operations. ECF No. 96 Attach. 50 at 80:2-11. Catania added that, for some repairs requiring construction, Amtrak brings "larger truck[s]" onto the Parcel, requiring Amtrak to block off several adjacent parking spaces so that the truck fits in the Parcel and store equipment. Catania Dep. at 43:10-18. In addition, in an emergency on the tracks such as a derailed train or a train fire, the fire department uses the Parcel to access the trains on short notice.

---

[36] Amtrak employees have carried the contaminated water through the Parcel by bucket under the current sharing arrangement on the Parcel. ECF No. 96 Attach. 50 at 87:12-15.

*Id.* at 49:5-19. There is no indication whether the fire depart-
ment would need cars cleared from the Parcel to access the
tracks. Amtrak has no evidence that the mezzanine would inter-
fere with its rights in the Parcel.

Railway Express contends that its predecessors-in-interest
used the Parcel for parking without complaint from Amtrak or
Amtrak's predecessors-in-interest, and accordingly Railway
Express's planned parking must not unreasonably interfere with
Amtrak's current uses. ECF No. 110 at 21. Amtrak counters that
although daily HABC and Railway Express employee parking does
not interfere with the easement, long-term, third party parking
would interfere unreasonably with it because the third party
cars constitute "indefinite or permanent interference[s] or
obstruction[s]" to the easement.[37]  ECF No. 86 Attach. 2 at 29.

Railway Express further contends that Amtrak's employees
have admitted they are able to work around the fence and cars
currently parked on the Parcel, demonstrating that the
improvements have not interfered with the easement. ECF No. 96
Attach. 1 at 48-49. It also relies on its expert's opinion that

---

[37] Amtrak relies on *Loveman v. Lay*, 271 Ala. 385, 391, 124 So. 2d
93, 97 (1960). In *Loveman*, the Supreme Court of Alabama held
that the owners of a ten-foot alley unreasonably interfered with
a right of way through it by parking their cars there. When the
easement holders tried to use the alley, they had to wait five
to fifteen minutes while the car owners came to the alley and
moved their cars, which was unreasonable. *Id.* Here, Amtrak
concedes that Railway Express (and, in the past, HABC) employee
parking does not unreasonably interfere with the easement.

Amtrak can perform all of its railway uses "on Amtrak owned property and/or in the area provided by Railway Express." ECF No. 96 Attach. 56 at 6.

Viewing the evidence in the light most favorable to Railway Express, there is a dispute of material fact as to whether Railway Express's planned commercial garage will unreasonably interfere with Amtrak's rights in the Parcel. Amtrak's motion for summary judgment will be denied on the issue of unreasonable interference.

C.    Railway Express's Cross-Motion for Summary Judgment

Railway Express moves for partial summary judgment, asking the Court to find that: (1) Amtrak's easement over Parcel 2 has "ceased, terminated, been abandoned, and/or otherwise no longer exists," (2) even if Amtrak's easement remains, Railway Express may construct a parking lot on the Parcel, and (3) Amtrak cannot exclude Railway Express from the Parcel. ECF No. 96 at 2-3.

1.    Amtrak did not Abandon its Rights in the Parcel

Because maintenance, storage, training, and emergency access are railway purposes under the agreement, Amtrak has continued to use the Parcel for railway purposes, has not abandoned the easement, and the easement has not ceased.[38]

---

[38] As a quasi-public corporation whose "continued vitality is an urgent public consideration," doubt regarding abandonment "should be resolved in favor of the railroad" if the case is close. *Marthens v. B & O R. Co.*, 170 W. Va. 33, 39, 289 S.E.2d

Similarly, that Amtrak can conduct some of the activities for which it uses the Parcel on other property does not invalidate the easement. Express easements do not depend on necessity. *Greenwalt v. McCardell*, 178 Md. 132, 139, 12 A.2d 522, 524 (1940).

> 2. There is a Dispute of Material Fact About Whether Railway Express's Commercial Parking Garage will Unreasonably Interfere with Amtrak's Use of the Parcel

Viewing the evidence in the light most favorable to Amtrak, as discussed above, there is a factual dispute about whether the fence and planned commercial garage will unreasonably interfere with Amtrak's easement. *See supra*, Part II.B.4. Accordingly, Railway Express's motion for summary judgment on the issue of constructing the garage will be denied.

> 3. Amtrak Cannot Exclude Railway Express from the Parcel

Railway Express contends that Amtrak seeks to "exclude [Railway Express] from using the ground level." ECF No. 96 Attach. 1 at 32. Amtrak does not request exclusive use, recognizing that Railway Express has "explicit" rights in the Parcel. ECF No. 103 at 4; *id*. at 4 n.6. Further, Amtrak concedes that some of Railway Express's improvements to the Parcel, such as paving the surface, are "expressly within the

_____

706, 712-13 (1982). Accordingly, even if the question were closer, doubt would be resolved in Amtrak's favor.

scope of Railway Express'[s] permitted uses of the parcels."
*Id.* at 34. Because Amtrak does not contend that it may exclude
Railway Express from the Parcel entirely, Railway Express's
motion for summary judgment will be granted in part: Amtrak may
not exclude Railway Express from using the Parcel.

    D.    Effect of the Preliminary Injunction

    The preliminary injunction will remain in place until
further notice.

III. Conclusion

    For the reasons stated above, Amtrak's motion for summary
judgment and Railway Express's cross-motion for summary judgment
will be granted in part and denied in part.

___11/30/11_____
Date

_____
William D. Quarles, Jr.
United States District Judge